IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

IN THE MATTER OF THE SEARCH OF

Elijah Eugene Wilson

Case No. <u>5:24-mj-05034-RES</u>

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Steven Waters, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search Elijah Eugene Wilson.  The requested warrant would permit law enforcement officers to collect a sample of Elijah Eugene Wilson's Deoxyribonucleic acid (DNA) by recovering saliva and skin cells from the inside of Wilson's mouth (buccal swabs) to compare to DNA samples to be collected from recovered firearms during this investigation.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (BATFE), and have been since March 6, 2005.  In this capacity, I routinely investigate violations of federal criminal statutes, to include violations of federal firearms, controlled substances, and explosives laws, and have specifically investigated violations related to the possession and use of firearms.  I have participated in investigations involving individuals who unlawfully possess firearms and of individuals illegally selling firearms.  As such, I have coordinated the controlled purchases of firearms utilizing confidential sources, cooperating witnesses and undercover law enforcement officers; written, obtained and coordinated the execution of search and arrest warrants pertaining to individuals involved in the illegal possession

and distribution of firearms and narcotics; conducted electronic and physical surveillance of individuals involved in illegal drug distribution; analyzed records documenting the purchase and sale of firearms and illegal drugs; provided testimony, both in Grand Jury proceedings and District Court proceedings; and spoken with informants and subjects, as well as local, state and federal law enforcement officers, regarding the manner in which individuals obtain, finance, store, manufacture, transport, and distribute their illegal firearms and drugs. From the years of 2011 to 2018, I was a Digital Media Collection Specialist with ATF's Digital Investigation Branch and assisted in multiple federal investigations involving extracting digital media from cellular telephones.

3.      I am currently investigating Elijah Eugene Wilson for offenses involving firearms to include violations hereafter "TARGET OFFENSES" specifically;

- **It shall be unlawful for any person except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce. 18 U.S.C. § 922(a)(1)(A).**

- **Except as otherwise provided by law, it shall be unlawful for any person to transfer or possess a machinegun. 18 U.S.C. § 922(o).**

- **Except as otherwise provided by law, it shall be unlawful for any person to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record. 26 U.S.C. § 5861(d).**

- **Except as otherwise provided by law, it shall be unlawful for any person to make a firearm in violation of the provisions of this chapter. 26 U.S.C. § 5861(f).**

- **It shall be unlawful for any person to ship, transport, transfer, cause to be transported, or otherwise dispose of to another person any firearm in or otherwise affecting interstate or foreign commerce, if such person knows or has reasonable cause to believe that the use, carrying, or possession of a firearm by the recipient would constitute a felony (as defined in section 932(a). 18 U.S.C. § 933.**

4.      Based on the facts set forth in this affidavit, there is probable cause to believe violations of the TARGET OFFENSES have been committed by WILSON, and that evidence recovered during the course of this investigation will be inspected for the presence of DNA, therefore a sample of WILSON's DNA is requested to be obtained for comparison.  The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of presenting probable cause, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause in order to obtain a search warrant for the collection of WILSON's DNA, further described in Attachment A, for the items described in Attachment B.  Elijah Eugene WILSON is believed to be physically located in the District of Kansas.

## APPLICABLE LAW & DEFINITIONS

### Unlawful Manufacture and Dealing Of Firearms

5.      Title 18, United States Code, Section 922(a)(1)(A) provides: "(a) It shall be unlawful -- (1) for any person-- (A) except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce."

6.      Title 18, United States Code, Section 921(a)(3) defines a "firearm" as "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a

projectile by the action of an explosive; the frame or receiver of any such weapon . . . ."

7.      Title 18, United States Code, Section 921(a)(10) defines a "manufacturer" in pertinent part as "any person engaged in the business of manufacturing firearms or ammunition for the purposes of sale or distribution."

8.      Title 18, United States Code, Section 921(a)(11) defines a "dealer" in pertinent part as "any person engaged in the business of selling firearms at wholesale or retail . . . ."  The term "engaged in the business" is further defined as follows: a "manufacturer" as "a person who devotes time attention and labor to manufacturing as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the firearms manufactured." 18 U.S.C. § 921(a)(21)(A).

9.      Title 18, United States Code, Section 921(a)(21)(C) defines a "dealer" as "a person who devotes time, attention and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms."

**Illegal Possession of Machineguns: 18 U.S.C. § 922(o)**

10.      Title 18, United States Code, Section 922(o) prohibits the transfer or possession of a machinegun as follows: (1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun. (2) This subsection does not apply with respect to (A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or (B) any

lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.[1]

11.     Title 18, United States Code, Section 921(a)(23) incorporates the definition of a machinegun in 26 U.S.C. § 5845(b): "The term 'machinegun' has the meaning given such term in section 5845(b) of the National Firearms Act (26 U.S.C. 5845(b))."

12.     A "machinegun" is defined in 26 U.S.C. § 5845(b) and 18 U.S.C. § 921(a)(24) as, "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."  (Emphasis supplied).

13.     Machinegun  Conversion  Devices,  hereinafter  "MCDs",  are  defined  as machineguns under the National Firearms Act, even when not installed.  MCDs fit this definition of "machinegun" under 26 U.S.C. § 5845(b) and 18 U.S.C. § 921(a)(24) due to being "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun." MCDs include traditional "Drop In Auto Sears," hereinafter  "DIAS",  designed  for  use  on  AR-type  firearms,  and  more  recently  developed "switches," designed for use on certain semiautomatic pistols.  MCDs are easily integrated with semiautomatic firearms to illegally convert them to fire automatically.

---

[1] Machinegun Prohibition.—Section 102(9) [amending section 922 of this title] shall take effect on the date of the enactment of this Act [May 19, 1986].

14.     Machineguns, including MCDs, may not be possessed or transferred under Federal law, although limited exceptions exist.  *See* 18 U.S.C. § 922(o), 27 C.F.R. 479.105.

15.     Title 26, United States Code, Section 5861(d) states: "It shall be unlawful for any person -- (d) to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record."  Title 26, United States Code, Section 5845(a)(6)-(7) provides: "For the purpose of this chapter-- (a) Firearm. The term "firearm" means . . . (6) a machinegun; (7) any silencer (as defined in section 921 of title 18, United States Code)."  Title 18, United States Code, Section 921(a)(24) provides: "The terms 'firearm silencer' and 'firearm muffler' mean any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication." 18 U.S.C. § 921(a)(24).

**Glock Conversion Devices**

16.     Based upon my training and experience, I am aware of conversion devices that have been designed and created for the sole purpose of converting semiautomatic Glock pistols into fully automatic machineguns.  These devices vary by design and appearance but all, when properly installed on a semi-automatic Glock pistol, will allow the firearm to expel more than one projectile by a single pull of the trigger at approximately 1,200 rounds per minute. Installation of these conversion devices is fast and simple, requires no technical expertise, and is completed by removing the polymer slide cover plate on a Glock semi-automatic pistol and replacing it with a conversion device.  I also know that these devices are referred to by different names, including but not limited to switches, auto sears, convertors, conversion switches, selector switches, conversion devices, fun switches, and Fire Selector Systems for Glock ("FSSGs").  I know that ATF considers

Glock conversion devices as post-May 19, 1986, machineguns.[2] Therefore, apart from official military and law enforcement use, Glock conversion devices may only be lawfully possessed by properly licensed FFLs who have paid the appropriate Special Occupational Tax ("SOT") required of individuals manufacturing, importing, or dealing in NFA weapons, including machineguns.

**Auto Sears and Selector Switches**

17.     The ATF has examined a part, commonly known as an "auto sear" and identified by various trade names, including "AR 15 auto sear," "drop in auto sear," and "auto sear II" (collectively referred to as the "Auto Sear"). The ATF has found that the addition of the Auto Sear to certain AR15 type semiautomatic rifles, manufactured with M16 internal components already installed, will convert such rifles to machineguns by enabling the firearm to shoot automatically more than one shot, without manual loading, by a single function of the trigger. Thus, the Auto Sear is "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun" and, consequently, constitutes a machinegun as defined by 26 U.S.C. § 5845(b). *See* 27 CFR 179.11.

18.     A "selector switch" is an item used to switch between semiautomatic and automatic fire.  The selector switch itself is only a firearm part and not considered a machinegun.

---

[2] Pursuant to ATF Rule 2006-2, as noted above, a part or parts designed and intended to convert a weapon into a machinegun, i.e., a weapon that will shoot automatically more than one shot, without manual reloading, by a single function of the trigger, is a machinegun under the NFA and GCA. ATF has determined that the device constitutes a machinegun under the NFA and GCA. This determination is consistent with the legislative history of the National Firearms Act in which the drafters equated "single function of the trigger" with "single pull of the trigger." *See*, *e.g*., National Firearms Act: Hearings Before the Comm. on Ways and Means, House of Representatives, Second Session on H.R. 9066, 73rd Cong., at 40 (1934).

### Use Of "80% Receivers" To Manufacture Firearms

19.     In firearms terminology, the "receiver" is the part of a firearm that houses the operating parts. There are many types and styles of firearm receivers. The term "80% receiver" is industry vernacular that refers to an unfinished firearm that has not yet reached the point in the manufacturing process where it should be classified as a "firearm" as defined by 18 U.S.C. § 922(a)(3). The unfinished receivers are usually fabricated to a point where minimal work needs to be completed by the purchaser to convert it into a "firearm."  Since "80% receivers" do not meet the definition of a firearm, they are not subject to the same requirements to purchase, transfer, or possess. "80% receivers" can be purchased by anyone, including prohibited persons, such as persons previously convicted of a crime punishable by more than one year in prison, and are often purchased through the Internet with no record keeping requirements.

20.     There are several methods to "manufacture" the unfinished receiver into a firearm. Some of these methods involve milling out or drilling the unfinished receiver. This can be accomplished by using different types of tools or machines such as a drill press, a milling machine, a rotary tool such as a Dremel, or a computer numerical control ("CNC") milling machine amongst others. CNC milling is a machining process that uses computerized controls and rotary cutting tools to progressively remove material from the working item, resulting in custom-designed part or product.  The process of drilling out or milling out the unfinished receiver generally creates metal shavings on or around the used equipment. Often, the unfinished receiver will come with a template to guide where milling or drilling must occur to complete the firearm.  Once the receiver has been completed, it is usually affixed with other firearms parts and accessories that constitute a firearm under federal law. There are numerous parts and accessories that can be added to the

receiver, such as barrels, stocks and triggers. These individual parts and accessories can also be purchased by any individual, including prohibited persons.

**PROBABLE CAUSE**

21.     On January 4, 2023, your affiant verified the subject on this investigation, WILSON, does not possess a Federal Firearms License "FFL".  A check of FFL holders includes licensed importers, licensed manufacturers, and/or licensed dealers of firearms.  Additionally, an FFL would be required to manufacture personally made machineguns. Your affiant further verified that WILSON does not have any NFA firearms (including machineguns) that are registered with ATF on the National Firearms Act register.

22.     Beginning in May of 2023, BATFE began an investigation into suspected Crip gang members including Marcos Arredondo and Daequan Rayton.  The investigation involved a confidential informant, hereafter referred to as CI, that assisted in making controlled purchases for this investigation. [3]

23.     On July 11, 2023, the CI, made a purchase of approximately 15 grams of suspected cocaine from Marcos Arredondo.  On July 13, 2023, the CI, made a purchase of approximately 29 grams of suspected cocaine, 200 suspected fentanyl pills and a Glock, model 19, 9mm pistol, serial number BGYT528 from Arredondo.  On July 31, 2023, the CI, made a purchase of approximately 29 grams of suspected cocaine, 200 suspected fentanyl pills and a Kel Tec, model Sub2000 9mm rifle, serial number FH8Z79 from Arredondo.

---

[3] Your Affiant notes here that sometime between October 14, 2023, and October 18, 2023, this CI absconded.  He was later indicted by the United States for unrelated drug activity.  The CI was taken into federal custody in Illinois on January 19, 2024 and was extradited to the District of Kansas.  The CI has continued to cooperate in the investigation for consideration in the CI's pending case.  The CI's purchases from Arredondo and Rayton, however, were monitored and corroborated by law enforcement and your Affiant has no concerns with the veracity or assistance of the CI during the purchases of these alleged machineguns and narcotics.

24.     On September 8, 2023, at approximately 1:38 p.m., the CI purchased a personally and privately made firearm that included a 3D printed drop in auto-sear that field tested as a machinegun, and therefore an unregistered NFA weapon, from Daequan Rayton.  Below is a photograph of the firearm purchased from Rayton on this date.



25.     On September 26, 2023, at approximately 1:30 p.m., the CI purchased two more personally and privately made machineguns that also included 3D printed drop in auto-sears that are also suspected machineguns and unregistered NFA weapons from Rayton.  Below are photographs of one of the 3D printed items contained in one of the firearms purchased from Rayton and the two firearms purchased on this date.



 

26.     During these September 2023 transactions, Rayton made statements to the CI of having a "guy" that manufactures these machineguns.  Rayton never provided the identity of this individual but claimed it to be a white male.  Phone tolls were collected on Rayton's cellular telephone which were unsuccessful in identifying the source of the manufactured machineguns. Phone tolls are often unsuccessful when individuals are communicating using social media platforms such as *Snapchat*.

27.     On November 11, 2023, officers of the Topeka Police Department contacted two individuals in a traffic stop including the driver, Arredondo, and the passenger, DuJontez Owens (a.k.a. Rue, a.k.a. Ruthless).  This traffic stop resulted in the recovery of a Glock pistol that

contained a "Glock switch" MCD, suspected cocaine, fentanyl pills, and marijuana, all of which field-tested positive for these respective controlled substances. The CI had previously purchased cocaine and fentanyl pills from Arredondo. (*See* paragraph 23 above). Following this contact, the cellular telephones of Arredondo and Owens were seized and lawful state search warrants to examine these cellular telephones were obtained by BATFE.

28.     The cellular telephone of Owens revealed a conversation using *Snapchat* that occurred on November 11, 2023, with a Username/Snapchat ID: "Lijah ShotDis" and Account: "pimpcity_e."  The Account "pimpcity_e" is believed to be WILSON's and was identified by the following:

a.   During the November 11, 2023, *Snapchat* conversation, "Lijah ShotDis" provided a telephone number of (785) 764-9641.  On August 7, 2022, in Lawrence Police Department report number L22036799 documenting a road rage incident, WILSON provided a contact telephone number of (785) 764-9641 to officers.

b.   BATFE researched the number of (785) 764-9641 in a database used by the Topeka Police Department and found this number to be associated with WILSON (with a last arrested date of November 17, 2023).

c.   The "Username/Snapchat ID" for account: "pimpcity_e" is "Lijah ShotDis" bearing the similarity to the first name "Elijah."

29.     On November 11, 2023, WILSON, using the *Snapchat* account "pimpcity_e" and Owens also using *Snapchat* engaged in a conversation detailed as follows:

1:08 a.m.– OWENS    I needa s hook

| | | |
|---|---|---|
| 1:09 a.m.– | WILSON | Call my number rq |
| 1:09 a.m.– | OWENS | Wat is it |
| 1:10 a.m.– | WILSON | 7857649641 |
| 1:21 a.m.– | WILSON | ? |
| 1:21 a.m.– | OWENS | I'm finna call I'm in a call |
| 1:21 a.m.– | WILSON | Ight bet |
| 2:00 a.m.– | WILSON | What a hook |
| 2:00 a.m.– | WILSON | Or shook |
| 2:02 a.m.– | OWENS | (Photo sent that is now expired and unavailable) |
| 2:05 a.m.– | WILSON | Juss one |
| 2:06 a.m.– | OWENS | Yea jus one rn ima need som more here soon though prolly like 3 or 4 but I jus need one rn |
| 2:06 a.m.– | WILSON | Ight bet |
| 2:06 a.m.– | WILSON | Tmr I got yu cause I gotta make one |
| 2:05 a.m.– | OWENS | Ight bet it's on |
| 3:31 a.m.– | WILSON | (Photo sent that is now expired and unavailable) |
| 3:35 a.m.– | OWENS | Istg bro |
| 7:28 a.m.– | WILSON | (Photo sent that is now expired and unavailable) |
| 2:36 p.m. – | WILSON | Yu finna be mobile yo pick it up |

30.     An "S hook" is believed to be a slang term for a drop in auto-sear due to the "s" like appearance.  WILSON also mentions "having to go make" the "s hook."

31.     On January 4, 2024, your affiant sent a preservation request to *Snapchat* for the account of "pimpcity_e" to preserve information related to this account.  On January 18, 2024, your affiant obtained a lawful federal search warrant for this account under case number 24-mj-5004-RES.

32.     Your affiant reviewed the file received from *Snapchat,* Inc., in response to the search warrant. (D.Kan.No. 24-mj-5004-RES).  The *Snapchat* account "pimpcity_e" was opened by WILSON on or about February 10, 2023, and the received file covered data from this date until December 15, 2023.  Several firearm photographs were observed being sent by WILSON to multiple individuals.  Your affiant also observed two videos of different machineguns being shot. One video involved WILSON in a field shooting a pistol with what appears to be a 3D printed

"Glock switch" MCD.  The second video is an unidentified black male with a shirt covering his face that appears to be an AR-15 type machinegun pistol shooting multiple rounds on the side of a gravel road.  Below are screen captures of these two videos observed in WILSON's *Snapchat* account.



33.    Additionally multiple photographs were observed of what appeared to be 3D printed "Glock switches" MCD, 3D printed drop-in auto sears, and what appeared to be a 3D printed frame of a handgun.  Many of these 3D printed items appeared to be light blue in color and consistent with those purchased in prior undercover purchases from Daequan Rayton.  WILSON also appears to be posting videos where WILSON has done engraving on personally made firearm pistol frames.  Lastly, WILSON's conversations revealed a reference to possessing and using a 3D printer in a context unrelated to firearms.  Below are screen captures of several photographs observed in WILSON's *Snapchat* account.





34.     Your affiant noticed a conversation in WILSON's *Snapchat* account with an unknown individual that possessed *Snapchat* account (sobbybobby999).  On September 8, 2023, at approximately 10:10 a.m., WILSON sent this individual three photographs of what appear to be personally and privately made firearms.  Additionally, on December 15, 2023, at approximately 10:51 a.m., WILSON sent a message to this same individual stating "Nope place a order and I'll build one."  *Snapchat* deleted what was sent by this unknown person, but your affiant could see WILSON's responses. Below are screen captures of these three photographs observed in WILSON's *Snapchat* account.





35.    Your affiant compared these three photographs sent by WILSON.  Your affiant noted the first bears a strong resemblance to the firearm purchased on September 8, 2023, by the CI from Daequan Rayton, however, it appears to have different markings and to not be the same firearm.  Your affiant noted the third photograph appeared to be one of the two firearms purchased by the CI on September 26, 2023, but have a different firearm magazine.  Below are side by side comparisons of the photograph sent by WILSON and the firearm recovered on September 26, 2023.



(Above - Photograph sent by WILSON on September 8, 2023)



(Above - Photograph of recovered firearm on September 26, 2023)

36.     Your affiant located additional social media for WILSON including a *Facebook*

page that appeared to be open to the public identified as

https://www.facebook.com/gunnaboy.ez.

37.     Your affiant noted WILSON updated a profile picture on December 9, 2023,

(screen capture taken by your affiant of that updated profile in "*Facebook* feed" below



38.     In WILSON's publicly accessible photographs, your affiant identified a photograph that appears to be taken in the same bathroom mirror, showing several firearms and an individual with their face obstructed.  In your affiant's training and experience, the firearm on the righthand side of this photograph appears to be a personally and privately made firearm based on the stainless-steel frame.   Below is the above-referenced photograph that was captured from WILSON's *Facebook* and appears to have been uploaded on February 1, 2023.



39.     Beginning on December 26, 2023, your affiant began working with United States Postal Service (USPS) Inspector Ryan Humar.  Inspector Humar searched USPS records and found three packages going to the address on WILSON's driver's license— 319 S.E. 44th Ter, Topeka, Kansas.

40.     One package was addressed to WILSON at the residence located at 319 S.E. 44th Ter, Topeka, Kansas, with an anticipated delivery date of December 29, 2023, sent from P.O. Box 397, Jackson, WI. 53037, USPS label 9400136105536996340596, and a mailing weight of .25lbs. The application for P.O. Box 397 out of Jackson, WI., was examined and found to belong to Aves

Rails (www.avesrails.com) with the website claiming to be "Your source for the most affordable DIY and 3D Printed firearm components!"

41.    On February 9, 2024, ATF conducted a "trash pull" at the residence located at 319 S.E. 44th Ter, Topeka, Kansas.  This is where law enforcement collects the trash at a location that has been placed away from the residence on either a curb or alley where the trash is collected on the scheduled day of the week.   The collection allows for valuable intelligence that law enforcement can gather about the residence located at 319 S.E. 44th Ter, Topeka, Kansas.  A search of the recovered trash resulted in the recovery of numerous documents including mail, court paperwork and medications belonging to multiple different individuals.   These individuals included WILSON and known relatives of WILSON.  Further found in the trash was an empty bag from FormulaMod for a FormulaMod Power Extension Solid Color Cable Kit.  Research of the company website revealed this is a cable kit for a 3D printer.  Also located was an empty package addressed to "Elijah" at the residence located at 319 S.E. 44th Ter, Topeka, Kansas, with a USPS tracking number from Hyschen, 7001 Vollmer Rd, Matteson, IL 60443.  Your affiant researched Hyschen and this address and discovered it to be an Amazon fulfillment center and Hyschen sells items for 3D printing.   United States Postal Inspector Ryan Humar informed your affiant the package was delivered to the residence located at 319 S.E. 44th Ter, Topeka, Kansas, on February 4, 2024.  Your affiant also discovered several baggies with a green leafy substance of suspected marijuana and one bag that had approximately 12.8 grams gross weight with packaging.  This substance field tested positive for marijuana.  Inside a plastic grocery bag that contained makeup items was two pieces of aluminum foil and one with a burn mark that is indicative of the use of fentanyl.  A broken blue pill was also located in this bag, but a field test was inconclusive.  A notebook with several telephone numbers and what appeared to be a drug ledger of pills was also

recovered.  This ledger and multiple baggies of suspected marijuana are known by your affiant to be indicators of narcotics trafficking.

42.     In this aforementioned "trash pull" your affiant also located in the trash a silencer, orange in color, which appeared to be made from a 3D printed material.  This item contained an outer body with integral end caps, baffle, spacers, and expansion chambers on the inside.  The device has a hole in one end for attachment to a firearm and a smaller hole on the forward end to allow a projectile to pass.  The device does not appear to have a serial number or markings in reference to a maker or manufacturer.  Inside the silencer baffling/expansion chambers could be observed and a grayish residue consistent with suspected gunpowder residue was observe at one end of the silencer.  Your affiant took the below photographs of the device and shared them with ATF Chief Eve Eisenbise, Firearms and Ammunition Technology Division.



43.     After a review of the photographs, ATF Chief Eve Eisenbise made preliminary findings and advised your affiant that the device classifies as a "firearm" as defined in the GCA, 18 U.S.C. § 921(a)(3)(**C**).  Further, that this this item, being a device for silencing, muffling, or

diminishing the report of a portable firearm, is a "**firearm silencer**" as defined in the GCA, 18 U.S.C. § 921(a)(25).   Additionally, this item, being a silencer by design, construction, and function; is therefore also a "**firearm**" as defined in the NFA, 26 U.S.C. § 5845(a)(7).  There does not appear to be any markings of identification or serial number as required by 26 U.S.C. § 5842.

44.     Search warrants were issued for the residence located at 319 S.E. 44th Terrace, Topeka, Kansas, and for the residence located at 440 S.E. Tefft Street, Apartment 8, Topeka, Kansas. (*See* D.Kan.Nos. 24-mj-05004-RES and 24-mj-05021-RES).   Both search warrants were executed on February 22, 2024.  WILSON was contacted at the residence located at 440 S.E. Tefft Street, Apartment 8, Topeka, Kansas.  Located at this apartment was a 3D printer, 3D printed firearm frames and numerous tools that could be utilized to manufacture firearms.

45.     Your affiant has sent recovered personally and privately made firearms to the ATF laboratory.  These personally and privately made firearms (*See* paragraphs 24 and 25 above) along with two other similar recovered firearms, all of which contained a 3D printed machinegun conversion device located inside of the firearm.  Your affiant requested the internal components of the submitted firearms be swabbed for the presence of DNA.  Your affiant requested the internal components be swabbed due to knowledge from training and experience that multiple individuals often touch the outside of the firearm; however, a limited number of individuals would handle the internal components of a firearm.  One individual who would handle the internal components of a firearm would include the individual that manufactured these firearms.  If a DNA profile is obtained, a known DNA sample from WILSON would be required for comparison.

46.     Deoxyribonucleic acid ("DNA") is a molecule that carries genetic instructions used in human biological functions.  DNA materials in chromosomes located in the nucleus of human

cells contain coding and noncoding regions.  Biological samples containing DNA can be analyzed through laboratory procedures to determine an individual's "genetic code."  This allows for the identification of an individual to a reasonable degree of certainty.

47.     DNA can be obtained from various biological samples including human skin cells. When an individual physically interacts with an object, an individual's DNA can be transferred onto the surface of the object.  This is often referred to as "touch DNA," meaning that in the process of an individual touching something, that individual may transfer skin cells onto the surface of the object.  The skin cells left on the surface of the object can contain an individual's DNA. That DNA can be analyzed through laboratory testing.  Such testing can inform law enforcement as to whether a particular individual interacted with a particular object.

48.     To determine if a particular individual touched or interacted with an object, the DNA collected from the object must be compared to a known sample.  This warrant would allow law enforcement to obtain biological material likely to contain DNA from the person of Elijah WILSON.  The requested warrant would allow the affiant to use a common procedure known as a "buccal swab."

49.     Buccal cell collection involves wiping a small piece of filter paper or a cotton swab, like a Q-tip, against the inside cheeks of an individual's mouth.  The procedure takes approximately one (1) to two (2) seconds per side of the individual's mouth.  The procedure carries no risk of physical pain, injury, or embarrassment to the individual.  While the swab or filter paper touches the inside of the individual's mouth, it does not require surgical intrusion beneath the skin.

50.     This buccal cell sample would then be compared with suspected biological material obtained from the firearms seized during this investigation by law enforcement.

## CONCLUSION

51.     I submit that this affidavit supports probable cause for a warrant to search the person of Elijah Eugene WILSON described in Attachment A and seize the items described in Attachment B.

## REQUEST FOR SEALING

52.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time.   Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

/s/ *Steven J. Waters*

Steven J. Waters
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1
by_____telephone_____, on April 2, 2024:

*Rachel Schwartz*

Hon. RACHEL E. SCHWARTZ
U.S. Magistrate Judge

## <u>ATTACHMENT A</u>

*Person to be searched*

This warrant applies to the search of the following person:

1.  Elijah Eugene Wilson, a Caucasian male, approximately 5'09" tall, weighing approximately 125 pounds, with a date of birth of November 8, 2002.

## **ATTACHMENT B**

*Items to be seized/Manner of Service*

1. This warrant allows the government to use a buccal cell collection procedure that involves the wiping of a small piece of filter paper or a cotton swab like a Q-tip against the inside cheeks of the mouth of the person described in Attachment A.

2. The government shall seize and retain the buccal cell samples for analysis.